**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-87 (TJK)** |
| **JOSEPH HOWE,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Joseph Howe to 57 months' imprisonment—the high end of the 46 to 57-month Guideline range agreed to by the parties—three years' supervised release, restitution of $2,000 to the Architect of the Capitol, and the mandatory special assessment of $100 per felony count of conviction.

## I.    INTRODUCTION

The defendant, Joseph Howe, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Howe, a production line worker from Elizabethtown, Kentucky, arrived in Washington, DC on the morning of January 6 with a plate carrier vest, a respirator mask, and goggles at the ready.   Before then-president Trump even concluded his speech at the rally at the Ellipse, Howe and his co-defendant Michael Sparks began making their way to the Capitol.   Howe was intent on getting inside the building, and to do so he assaulted at least four police officers on his way to and inside the building.   Howe, who is 6'4" and 210 pounds, wearing his goggles and other protective gear, first ripped a police shield from the arms of an officer in his quest to break through the police line on the Northwest Stairs; that officer was then knocked to the ground and later was treated for a head injury.   Further up the stairs, Howe sprayed a line of officers with a cannister of what appears to be pepper spray or OC spray.   Next, after the mob broke through that line, Howe pushed another officer who was blocking his way up the stairs, causing that officer to stumble forward. Howe succeeded in breaking through every police line and was one of the very first rioters to reach the Senate Wing Door.   He kicked at the door before it was open, and, after his friend jumped through the broken window and others opened the door from the inside, he entered the building and continued to assault the police.   Inside, Howe took hold of a Capitol fire extinguisher and sprayed it directly at police officers, causing the officers to lose their breath and become incapacitated.   And afterwards, Howe lied to the FBI, concealing his identity and his involvement in the riot for more than 18 months after his friend Sparks was arrested.

The government recommends that the Court sentence Howe to 57 months of incarceration, which is the high end of the advisory Guidelines' range of 46 to 57 months agreed on by the parties.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

A 57-month sentence reflects the gravity of Howe's efforts to obstruct the Congressional proceeding and his multiple assaults on federal officers, including his uncharged relevant conduct, but also acknowledges his guilty plea in this case.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 68, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Howe's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

Joseph Howe worked at an electronics and components plant in Elizabethtown, Kentucky, along with his friend Michael Sparks.   After the November 2020 election, Howe and Sparks traveled to Washington, DC for a pro-Trump rally in December 2020.   Shortly after that, they made plans to travel to DC once again, for the "Stop the Steal" rally scheduled for January 6, 2021. This time, they rented a van and collected a group of work friends to join them.   To prepare for the trip, Howe created a GoFundMe campaign hoping to raise money, and in return he suggested that he would document the events on his Parler account.   He concluded his fundraising post, "#helpstopthesteal #Trump2020."   (Only one acquaintance contributed a total of $50.)

Howe came to DC on January 6, 2021, prepared for violence.   He wore a plate carrier vest and carried a large backpack with a respirator mask, goggles, and other supplies.   His group attended then-president Trump's speech, but they did not stay for the conclusion; instead, Howe, Sparks, and the others began walking to the Capitol building.   Along the way, they spoke to

someone filming the events and interviewing participants.   Of the U.S. Capitol, Howe insisted, on camera, "We're getting in that building."   *See* Exhibit A (video of Howe, Sparks, and their friends walking from Ellipse to Capitol), timestamp 0:12.   When the cameraman expressed skepticism, Howe insisted, repeating five times that "we're getting in it."   Someone suggested that all it would take is one person to get inside, and "the rest is following."   Howe added, "Let it go south in there."   *Id.*, timestamp 0:28.

Howe and Sparks made their way onto the restricted Capitol grounds, past downed bike racks, trampled snow fencing, and "Area Closed" signs.   The scene was chaotic and dangerous, and the mob was already engaged in battle with the police.   Not long after he got to the restricted Capitol grounds, Howe, by his own description, saw another rioter having a medical emergency, and helped carry the man using a bike rack as a makeshift stretcher to an ambulance outside the fray.   Nevertheless, knowing the dangers, Howe chose to immediately return to the mob and join in the violence. As he approached the Northwest Stairs at the foot of the West Plaza, police reinforcements were staging to help the U.S. Capitol Police officers who had already been overrun by rioters.   A rioter with a bullhorn screamed at the police, "fucking oath breakers!," as Howe passed by, undeterred.[2]

Howe then ascended the Northwest stairs, under the scaffolding that was in the process of being built for the upcoming inauguration.   The area was filled with rioters fighting with police officers.   Police had deployed pepper spray in an effort to disburse the crowd in that area, but that did not stop Howe's advance.   He put on his goggles and respirator mask and continued up the stairs, with rioters climbing the scaffolding and attacking the police all around him.

---

[2] "RollingRenfroes (kbrenfroe) Part 5 of 6 - What really happened at Trump rally in D.C.," *available at*  https://www.youtube.com/watch?v=Fz6gwQpfQ9k&t=213  (timestamp 3:30; last visited Oct. 12, 2023).

Inside the scaffolding, Howe encountered a line of police officers trying to prevent the mob from advancing further toward the building.   He made his way to the front of that group, to a doorway inside the scaffolding that served as a choke point where police officers were manning the opening.   Rioters began breaking through, surrounding the police and attacking them—now from both below and above.   *See* Exhibit B (video inside scaffolding), timestamp 1:30.   U.S. Capitol Police Officer A.C. was among the outnumbered police officers there.   Howe saw him struggling, and grabbed the riot shield Officer A.C. was holding, ripping it from the officer's hands. *Id.*, timestamp 1:50.   Howe took control of the shield, preventing the officer from being able to use it for his own protection.



*Still from Exhibit B, timestamp 1:52 – Howe, right, with goggles and respirator as he takes control of Officer A.C.'s riot shield*

Within seconds of Howe grabbing Officer A.C.'s shield, the officer was attacked by other rioters, hit in the head with rebar and an object he inferred was a baseball bat, and he fell to the ground on the hard stone steps.   *See* Exhibit C (RMG News video excerpt), timestamp 0:50.



*Still from Exhibit C, timestamp 0:50 – Officer A.C. (left, facing away) attacked from other side of doorway by rioters immediately after Howe (behind the wall to left) disarmed him*

After this attack, Officer A.C. remained at the Capitol helping to evacuate Senators and staffers. But later that afternoon, he developed tunnel vision and fell out of consciousness.   He only came to when he was being treated in an ambulance on his way to the trauma room at the hospital.   He was diagnosed with a concussion, blunt force trauma to the head, and other injuries to his body.

Holding Officer A.C.'s shield, Howe passed through the doorway Officer A.C. had been fighting to defend and made his way further up the stairs.   *See* Exhibit B, timestamp 2:05.   He passed the shield up the stairs to other rioters who were facing off with the next police line at the landing, at the top of the scaffolding.   *Id.*, at 2:23.   Howe progressed up the stairs and approached the police line.   Once he reached the remaining barricades, video footage shows Howe holding a cannister and deploying an aerosol cannister of what appears to be bear spray or pepper spray against the police guarding the top of the stairs.



*Still from Exhibit C, timestamp 3:26 – Howe (face and gloved hand each circled in yellow) deploying what appears to be bear spray or pepper spray at the police line*



*Still from Exhibit D, timestamp 0:52 – Howe's gloved hand spraying toward officers*

Howe joined the group of rioters near the landing in a joint effort to wrest the bike racks away from the police and break through the line.



*Still from Exhibit D, timestamp 2:14 – Howe, center (with goggles and gas mask), near top of landing as rioters tear bike racks from the police*

The police struggled for control of area, and some officers used their batons to try to keep rioters back.   At this time, Howe can be seen with a police baton in his hand, which he swung in the direction of the bike racks.   He then collapsed the baton and stored it in his pocket.



*Still from Exhibit D, timestamp 3:42 – Howe holding police baton above his head, ready to strike*

Shortly thereafter, this police line fell, and Howe and Sparks progressed to the landing just outside the scaffolding.   There, they waited for the next police line to fall, and as soon as the crowd forced that next line apart, Howe and Sparks ran forward up the remaining steps to the Upper West Terrace.   While he ran up the steps, Howe pushed a U.S. Capitol Police officer who was trying to stop the crowd.   *See* Exhibit E (U.S. Capitol Police CCTV footage), timestamp 0:08. The officer stumbled forward when Howe pushed.



*Still from Exhibit E, timestamp 0:08 – Howe shoving police officer as he runs up the stairs*

Howe arrived at the top of the stairs to face off against one last police line, where the officers again struggled to hold the mob back using bike racks and batons.   *See* Exhibit D, timestamp 10:05 (showing Howe at top of stairs to Upper West Terrace).   Howe, front and center of the mob, helped the rioters quickly overrun that final line of police defending the building.   He ran toward the first available entrance—the Senate Wing Door—with a small group of other rioters.   Like Howe, many of the rioters he was with at this precipice wore tactical gear—vests, goggles, masks, and even helmets and flak jackets.   *See* Exhibit F (video showing Howe and other

rioters at Senate Wing Door).   Clearly, Howe was in a mob of angry men prepared to engage in violence and destruction.   And he joined right in, forcefully kicking at the Senate Wing Door in an effort to break into the building.   The rioters he was with used their bare fists, metal clubs, wooden beams, and other implements to smash the glass in that door and the surrounding windows. *See* Exhibit F; *see also* Exhibit C, timestamp 12:30 – 13:20.



*Still from Exhibit F, timestamp 0:09 – Howe kicking at the Senate Wing Door as rioters around him smash out the windows and begin jumping into the building through the broken glass*

As Howe kicked the door in, Sparks jumped through the adjacent broken window.   Sparks was the very first rioter to enter the Capitol that day.   A lone police officer encountered him from inside, but the officer quickly understood that his resources and weapons were no match for the stream of rioters about to overtake the building.

After Sparks jumped in, a great number of fellow rioters followed him, and some of them paused to open the door Howe had been trying to open from the outside.   Howe walked in at 2:13 p.m. and made his way to the Crypt and then toward the Memorial Door.   Throngs of people

joined him.   The mob was stopped by another makeshift police line as they approached the small

rotunda near the Memorial Door—which led to the stairs directly beneath Speaker of the House

Nancy Pelosi's office suite.   *See* Exhibit G (video of police altercation).   The small group of U.S.

Capitol Police officers tried to hold back the swelling crowd, but the mob was angry and violent,

and pushed the officers back down a small set of stairs.   *Id.*, timestamp 1:11.   At least one of the

officers fell to the ground, including U.S. Capitol Police Officer K.Y., and Howe took advantage

of their moment of weakness to seize a fire extinguisher he found on the floor of the Capitol near

the doorway.   *See* Exhibit H (video of Howe pulling the pin from fire extinguisher).



*Still from Exhibit H, timestamp 0:02 – Howe (circled in yellow) as he pulls the pin and prepares*
*to deploy the fire extinguisher at U.S. Capitol Police Officers K.Y. and D.L.*

Seconds after, Howe deployed the stolen fire extinguisher directly in the face of Officer K.Y.

Officer K.Y. recalled that he had just been pushed to the ground on his back by another rioter and

was then sprayed in the face with Howe's fire extinguisher.   He lost his breath momentarily as a

result.   Because of the nature of the chemical in the fire extinguisher, Officer K.Y. and his three police officer colleagues in the immediate vicinity were forced to exit the building so they could catch their breath in the fresh air.   Officer K.Y. recalled that the whole area was completely gassed, and the situation was "insane."   Undoubtedly, the absence of these officers, even for a short time, contributed to the dangers and risks facing the lawmakers, staffers, and police officers in the Capitol building at that time, and gave the rioters another advantage.   U.S. Capitol Police Officer D.L., who was also part of that small line of officers, recalled being sprayed with the fire extinguisher as well; as a result his vision was affected and he was incapacitated.   Officer D.L. recalled that at this time, he considered drawing his weapon, but he realized that the rioters surrounding him and his fellow officers were wearing heavy-duty, military-style armor, Kevlar, and helmets, and his sidearm would be useless.

Howe's purpose in storming the Capitol building, and his motive for attacking several police officers in his quest to get there and remain there, was to obstruct the Joint Session of Congress scheduled to occur that day, and to stop the certification of the Electoral College vote. Howe's repeated violent actions show that he was willing to do so by any means necessary.   And, of course, the proceedings did stop; Howe and his fellow rioters succeeded in their obstructive goals, at least temporarily.

By 2:38 p.m., Howe exited the Crypt through the Capitol Visitor's Center.   No further footage of Howe inside the Capitol has been located, and it appears he was back outside on the restricted grounds by about 3:15 p.m.

### *Aftermath of January 6 and Defendant's Statements*

Eventually, after leaving the Capitol building, Howe rejoined his friends and they travelled together to their hotel room in Washington, D.C.   Almost immediately, they learned that Sparks—

who had also entered the Capitol and was involved in an altercation with a U.S. Capitol Police Officer which quickly made national news—had his picture plastered everywhere on social media and news outlets.   Sparks quickly became a wanted man.   The next day, as the group drove home, Sparks called the D.C. Metropolitan Police Department and offered to turn himself in; he was arrested a few days later.   As investigators pieced together the evidence against Sparks, they interviewed his travel companions, including Howe.   Howe chose to conceal his involvement. When the FBI asked him for an interview, he agreed, but he told them a series of lies.   In April 2021, Howe told the FBI that he had never entered the Capitol building.   He acknowledged that his friend Sparks had gone inside, but Howe pretended that he (Howe) had merely walked up the Capitol steps, looked through the broken windows, and never went inside.

Only after more than a year had passed did investigators discover evidence that Howe not only had gone inside—decked out in a plate carrier vest, goggles, and a gas mask—but he had assaulted multiple police officers (with his hands, pepper spray, and fire extinguisher chemicals) on his way to get there.   The FBI returned to Howe in October 2022 and again asked for an interview; again Howe agreed.   Once again, Howe lied, insisting that he had not gone inside.   He was once again eager to point out that he had helped a rioter who was experiencing a medical problem—but he did not describe the many ways he had assaulted and injured police officers guarding the Capitol.   In this October 2022 interview, FBI agents confronted Howe with photos of himself with the police baton described above; Howe claimed he could not remember having it and that his memory was very fuzzy from that day.   He suggested he didn't remember if he just picked the baton up from the ground—but he admitted that he didn't own a police baton or borrow one from anyone either.   Agents showed Howe some additional photos of Howe at the landing of the Northwest Stairs, and he conceded, "I know I'm in trouble."   Then he chose to end the

interview.

Following his guilty plea, and as required by his plea agreement, Howe was interviewed again in September 2023.   Even after his guilty plea to Obstruction of an Official Proceeding and Assault, ECF 67, and after admitting the facts set out in the Statement of Offense, ECF 68, Howe's description of his conduct and his state of mind were less than forthcoming.   When asked about his insistence on the National Mall, "we're getting in that building," Howe claimed he "was not aware that protesting was not allowed in the building or around the building, until we got there." He doubled down on this dubious claim, asserting, "I literally thought you could protest there." Astoundingly, when challenged about his conduct trying to kick the Senate Wing Door in as rioters around him smashed the windows with weapons, he placed the blame on the police, suggesting that he should never have been allowed to get that close to the building.   He said his emotions overwhelmed him and a switch flipped after he helped the man experiencing a medical problem. He said he felt angered that the police were deploying crowd control techniques ("pellets and tear gas and explosions and stuff"), so he got closer so that he could "just voice my opinion about it." Clearly, Howe's actions and his admissions in his plea agreement demonstrate that he was violently attacking the Capitol for reasons beyond "just voic[ing] my opinion," but Howe has consistently refused to acknowledge the gravity of his violent actions.

## III.   THE CHARGES AND PLEA AGREEMENT

On November 9, 2022, a federal grand jury returned a second superseding indictment charging Howe with eleven counts, including, relevant here, Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One), and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Four).   On August 1, 2023, Howe pleaded guilty to these two offenses, pursuant to a plea agreement.   ECF 67.   As part of the plea

agreement, the government agreed to dismiss the remaining counts in the second superseding indictment, including Obstructing Law Enforcement Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Three); an additional violation of 18 U.S.C. § 111(a)(1) (Count Five); Destruction of Government Property, in violation of 18 U.S.C. § 1361 (Count Six); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Seven); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly and Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Eight); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(4) (Count Nine); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Twelve); Engaging in an Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Thirteen); and Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(G).

## IV.  STATUTORY PENALTIES

Joseph Howe now faces sentencing on Obstruction of an Official Proceeding and Assault of a Federal Officer.   As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count One, and up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count Four.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The revised PSR includes an error in the Guidelines calculation, in that it does not include a Guidelines analysis for both Counts—Counts One and Four—to which the defendant pleaded guilty. *See* PSR ¶¶ 40-51.[3]  That Guidelines analysis follows:

| Count One, 18 U.S.C. § 1512(c)(2): | | | |
|---|---|---|---|
| U.S.S.G. §2J1.2(a) | Base offense level | | 14 |
| U.S.S.G. §2J1.2(b)(1)(B) | Causing or threatening injury or property damage: | | +8 |
| U.S.S.G. §2J1.2(b)(2) | Substantial interference | | +3 |
| | | Sub-total | 25 |
| | | | |
| Count Four, 18 U.S.C. 111(a)(1): | | | |
| U.S.S.G. §2A2.2(a) Base offense level: | | | 14 |
| U.S.S.G. §2A2.2(b)(3)(A) Victim sustained bodily injury | | | +3 |
| U.S.S.G. §3A1.2 Official victim | | | +6 |
| | | Sub-total | 23 |
| | | | |
| Combined Offense Level: | | | |
| U.S.S.G. §3D1.2(c) Counts group | | | +0 |
| U.S.S.G. §3D1.3(a) Offense level for most serious count | | | 25 |
| | | | |
| | | **Total** | **25** |

*See* Plea Agreement at ¶¶ 5(A).

---

[3] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see* PSR ¶ 38) that Counts One and Four group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

The U.S. Probation Office calculated the defendant's criminal history as category II, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 22, Howe's Guidelines imprisonment range is 46 to 57 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Howe's felonious conduct on the front lines and in critical chokepoints on January 6, 2021 helped to unleash a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Worse, Howe's violent conduct directly contributed to injuries suffered by at least three officers that day, one of whom wound up unconscious and required treatment at the emergency room. Howe planned in advance for violence at the Capitol, proudly proclaimed his mission to "get in that building" as he approached, reached the very first breach point among the most fervent and determined rioters, where he kicked at the Senate Wing Door attempting to break in, and in doing so he violently assaulted several police officers, making use of at least two different types of chemical weapons to force his way through the police lines.   Even as recently as September 2023, after entering his guilty plea in this case, Howe blames his conduct—and his ability to enter the building at all—on the police, who in his estimation failed to try hard enough to stop him.   The nature and circumstances of Howe's offenses were of the utmost seriousness, and fully support the

government's recommended sentence of 57 months.

### B. The History and Characteristics of the Defendant

Howe, who was born and still lives in Elizabethtown, Kentucky and works on the production line at a factory in his hometown.   He is a healthy, 6'4", 210-pound healthy 41-year-old man.   He sustained his first criminal conviction at the age of 30—for criminal trespassing.   PSR ¶ 53.   (No further information is known about the facts of that offense.)   A year later, he sustained another criminal conviction, for driving under the influence; he was sentenced to four days in jail.   PSR ¶ 54.   Two years later, at the age of 33, Howe was convicted for another drunk driving offense, and was sentenced to 10 days in jail.   PSR ¶ 56.   Despite these indications of trouble with alcohol consumption, Howe reported to the Probation Office that he only consumes alcohol on special occasions and that he has no concerns with alcohol.   PSR ¶ 75.

Despite his self-described "'cookie cutter' childhood" and a healthy upbringing with family support, PSR ¶ 65-66, Howe nevertheless has demonstrated his willingness to break the law, both in his prior convictions and in his violent actions on January 6.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Howe's criminal conduct on January 6 was the epitome of disrespect for the law. He was front and center at critical moments when the mob overran the police early in the riot, and he contributed to the mob's ability to breach the police lines in several key places on the approach to the Capitol building.   Moreover, Howe's actions since that day demonstrate his continued disrespect for the law.   When the FBI asked him for a voluntary interview in April 2021, as they investigated Sparks, Howe used the opportunity to deflect any attention and lie about his conduct. He did the same in October 2022, when, unbeknownst to him, the FBI had assembled evidence of

his assaults.   He was willing to acknowledge his behavior only when confronted by incontrovertible video evidence, and even then, has offered only minimal explanations.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to deter this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   For more than a year and a half, Howe planned to evade detection and arrest, lying to the FBI about his role in his friend Michael Sparks's criminal acts.   In signing his plea agreement and admitting the facts laid out in the Statement of Offense, Howe acknowledged his wrongdoing, but his expressions of remorse appear more connected to his criminal conviction than any sincere regret for the damage and injuries he caused.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

his actions.") (statement of Judge Chutkan).  Howe's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, those cases involving defendants convicted of violating 18 U.S.C. § 1512(c)(2) who drove the initial breach of the building, assaulted officers in multiple locations, and/or used fire extinguishers against the police provide appropriate comparisons to the relevant sentencing considerations in this case.

This Court sentenced defendant Douglas Jensen to 60 months imprisonment after a jury convicted him of violating 18 U.S.C. §§ 1512(c)(2), 111(a), and related charges.   Case No. 21-cr-6 (TJK).   The Court calculated a sentencing guidelines range of 57-71 months imprisonment, and the government recommended a midrange sentence of 64 months imprisonment. *See United States v. Jensen*, 21-cr-6-TJK, 12/16/2022 Sentencing Tr. at 16, 33. Jensen acted as a ringleader who encouraged rioters to follow him through the building and was one of the first ten rioters to enter the Capitol.  *See Jensen*, ECF 107 (Government's Sentencing Memorandum).  He then led a group of rioters armed with weapons in a menacing pursuit of a U.S. Capitol Police officer to

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

within steps of the Senate chamber. Unlike Jensen, Howe accepted responsibility for his conduct through his guilty plea and is entitled to acceptance of responsibility under U.S.S.G. §3E1.1. However, Howe's conduct nonetheless merits a similar term of imprisonment because, unlike Jensen, he engaged in repeated physical attacks on officers throughout the Capitol, including at least one that involved a dangerous chemical and another that caused a head injury to a police officer.

This Court also sentenced defendant Dale Shalvey to 41 months imprisonment after he pleaded guilty to violating 18 U.S.C. §§ 1512(c)(2) and 111(a).  Case No. 21-cr-334 (TJK). Shalvey's Guidelines range was 41-51 months imprisonment, and the government recommended a high-end sentence of 51 months.  Shalvey assaulted a police officer on the West Front during the initial breach of the Capitol by hitting him with an object at close range.  He then entered the building and proceeded to the Senate chamber where he rifled through Senators' desks, took pictures of their documents, and stole and destroyed a letter written by Senator Mitt Romney.  *See Shalvey*, ECF 103 (Government's Sentencing Memorandum). Shalvey, like Howe, accepted responsibility for his conduct and was entitled to acceptance of responsibility under U.S.S.G. §3E1.1. However, Howe's conduct merits a higher term of incarceration in light of his repeated assaults on officers and the resulting injury—which did not apply in Shalvey's case.

Judge Friedrich sentenced Ronald Sandlin to 63 months imprisonment after Sandlin pleaded guilty to violating 18 U.S.C. §§ 1512(k) and 111(a). Case No. 21-cr-88 (DLF), 12/09/2022 Sentencing Tr. at 36, 91.  Like Howe, Sandlin planned for violence on January 6, though his preparation went further; he brought a car full of weapons including knives, bear spray, and his pistol, to Washington, D.C.  Also like Howe, Sandlin helped lead the mob's charge against officers at two separate choke points, leading to the rioters' successful breach of both places.  In

Sandlin's case, those were the Rotunda doors and the Senate Gallery.   And like Howe, Sandlin assaulted multiple officers, including by attempting to remove one officer's helmet—an act similar to Howe's disarming Officer A.C. of his protective shield.   *See Sandlin*, ECF 103 (Government's Sentencing Memorandum).   Howe's conduct is similar and warrants a comparable sentence.

This court should also consider cases involving defendants who sprayed fire extinguishers at officers during the attack.   Defendant Robert Palmer assaulted officers stationed in the Lower West Terrace tunnel by throwing large objects at them including a wooden plank, and by spraying the contents of a fire-extinguisher at them.   Case No. 21-cr-328 (TSC), ECF 30.   Unlike Howe, Palmer was not charged with a violation of 18 U.S.C. § 1512(c)(2) and pleaded guilty to violating 18 U.S.C. § 111(b).   Judge Chutkan imposed the government's recommended sentence of 63 months' imprisonment—the low end of the applicable Guidelines range. *See Palmer*, 12/17/2021 Sentencing Tr. at 9, 46.   Likewise, defendant Matthew Miller threw objects and sprayed a fire extinguisher at officers in the same area and pleaded to violations of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1). Case No. 21-cr-75 (RDM), ECF 67.   Judge Moss varied down from the applicable 41-51 month Guideline range for a sentence of 33 months' incarceration. *See Miller,* 5/23/2022 Sentencing Tr. at 19, 27, 74. However, neither Palmer nor Miller drove the initial breach of the building as Howe did by assaulting officers in multiple locations and causing injury.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Howe must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of December 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Howe's restitution payment must

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 112.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months' imprisonment, three years' supervised release, restitution of $2,000 to the Architect of the Capitol, and the mandatory special assessment of $100 per felony count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Emily W. Allen*
EMILY W. ALLEN
SONIA MITTAL
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20004
emily.allen@usdoj.gov
(907) 271-4724