Gretchen L. Staft
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, Alaska 99503
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: EMAIL@fd.org

*Counsel for Defendant Joseph Howe*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>JOSEPH HOWE,<br><br>　　　　　　　Defendant. | Case No. 1:21-cr-00087-TJK-002<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

　　　Defendant Joseph Howe, through counsel, Assistant Federal Defender Gretchen Staft, submits this memorandum in anticipation of his sentencing hearing scheduled for October 20, 2023 at 2:00 p.m. At sentencing, Mr. Howe will ask the Court to consider imposing home confinement in lieu of a portion of his incarceration.

　　　Though Mr. Howe unquestionably made a series of terrible choices on January 6 – choices that negatively impacted numerous officers, congressional proceedings, and the community of Washington, D.C. – those choices do not reflect his overall character, and he is deeply regretful of his actions. While he understands he will receive a term of incarceration and is prepared to accept his punishment, the defense respectfully requests the Court impose home confinement and other conditions of supervised release, such as community work service, in lieu of a portion the incarceration he might otherwise receive,

in order to reduce the impact of his sentence on his family whom were uninvolved in the events of January 6. Such a sentence would reflect the nature and circumstances of the offense as well as Mr. Howe's history and characteristics, and would be sufficient, but not more than necessary to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I.   ADVISORY GUIDELINE COMPUTATION

The PSR calculates a total offense level of 22, with a corresponding guideline range of 46 to 57 months (Criminal History Category II). PSR ¶ 89. Mr. Howe does not object to the guideline calculation in the technical sense but asks the Court to consider a downward variance and/or home confinement in lieu of a portion of incarceration because the guideline range does not fully implement the statutory objectives of sentencing.

## II.   STATUTORY SENTENCING FACTORS

As a general matter, strict adherence to the sentencing guidelines was struck down in *United States v. Booker*, 543 U.S. 220 (2005). Rather, the guidelines are just one of many factors the court must consider to fashion a sentence that is "sufficient but not greater than necessary" to achieve the sentencing goals enumerated in 18 U.S.C. § 3553(a). *Id*.

While all sentencing proceedings are to begin by determining the applicable guideline range, the District Court may not presume the guideline range is reasonable. *Rita v. United States*, 551 U.S. 338, 352 (2007)(citing *Booker*, 543 U.S. at 259-60). Nor should the guidelines range be given more or less weight than any of the sentencing factors among

those set out in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *Gall v. United States*, 552 U.S. 38, 46 (2007).

In this case, imposing home confinement in lieu of a portion of incarceration is a fair application of §3553(a) factors, including the advisory sentencing guidelines.

1) The Nature and Circumstances of the Offense

Mr. Howe had not really been political before Donald Trump entered politics. However, throughout the course of his presidency, Mr. Howe became increasingly interested in Trump and, without making excuses for his own conduct, he admits he had been living in an echo chamber leading up to the events on January 6 and believed the rhetoric he followed. He sincerely regrets his actions and wishes he had not gotten involved in politics at all. His actions that day do not reflect his current views of the 2020 election, or more importantly, his values as a human being.

On January 6, 2021, Mr. Howe attended the "Stop the Steal" rally with a group of co-workers. He brought with him a protective vest,[1] goggles, and a respirator mask because at previous rallies, counter-protestors had stabbed, pepper-sprayed, and thrown urine on Trump supporters. At the tail end of Trump's speech, he and others walked toward the Capitol building. Though he quickly realized otherwise,[2] before arriving at the Capitol, he

---

[1] Though he wore a plate carrier vest, there were no plates inside the vest, but he hoped that it would offer protection against a knife attack in the event he was attacked.
[2] Mr. Howe does not contend that he believed his entry and actions in attempt to enter the Capitol once on Capitol grounds were lawful.

had believed protesting was permitted in the Capitol, and he hoped to be one of the protestors to do so. By the time he arrived at the Capitol, the grounds were already in chaos.



Mr. Howe did not arrive at the Capitol in all his protective gear ready to storm the Capitol. Rather, he milled around rather aimlessly until he encountered a man having a medical emergency, whom authorities did not appear to be assisting. Mr. Howe helped keep the crowd at bay while a woman performed CPR on the man. Once they eventually saw an ambulance in the distance, Mr. Howe assisted others in carrying the man to the ambulance on a bike rack, which they used as a makeshift stretcher, while the woman continued chest compressions.[3]

---

[3] https://www.youtube.com/watch?v=6iwUVSFmCaA&t=621s at 10:20.



After returning from helping this man is when everything changed for Mr. Howe. He suddenly seemed surrounded by the loud bangs of concussion grenades and tear gas, and everything, including Mr. Howe, became more aggressive. When recently interviewed by the government and asked why he did what he did that day, he responded that he had been asking himself that very question every day since January 6, and all he could really come up with was getting caught up in the mob mentality and "stupidity. … absolute stupidity."

    Mr. Howe and hoards of angry rioters jammed themselves onto the Northwest stairs toward the Capitol. In his attempt to get up the stairs, Mr. Howe, along with other rioters,

grabbed and took a police shield from Officer A.C., who had been attempting to prevent the crowd's advance through a temporary door. Thereafter, Officer A.C. was assaulted by two protestors on the other side of the door who shoved his head into the doorframe and assaulted him on the ground. Disturbingly, that was not the first time Officer A.C. had been assaulted that day; he reports that he was struck in the head three separate times by different individuals during his movement though the Capitol grounds even before his shield was taken.[4] It is unknown if any of these attackers have been apprehended, but there is no question that Officer A.C. suffered considerable pain and trauma that day, and even if Mr. Howe did not directly injure him, he deeply regrets contributing to the overall trauma A.C. suffered.

Mr. Howe continued to act aggressively and recklessly on his continued approach to the Capitol doors, helping remove a barrier, hitting barriers with a found baton, and pushing an officer during his sprint up the steps.[5] When he arrived at the Senate Wing Doors, he forcefully kicked at the door before another protestor opened the door from the inside and let him in. While inside the Capitol, he discharged a fire extinguisher which was in the immediate vicinity of at least one officer, who temporarily lost his breath as a result.

---

[4] Officer A.C. reported that, prior to his shield being taken, he was struck in the head three times: once with a piece of rebar by a clean-shaven white male wearing a yellow bandana and swim goggles on the Lower West Terrace, once with a flagpole by a white male with an American flag bandana under his chin, and once by a heavy-set black male in a grey sweatshirt.
[5] While it appears Mr. Howe sprayed an unknown substance during his ascent up the steps, he did not spray officers with the substance, and no one appears to have been affected by it.

Mr. Howe is ashamed of his actions on January 6 and regrets the impact his actions had on others, particularly the law enforcement officers affected. He has never boasted or bragged about his actions that day. Though he admittedly was less than forthcoming to investigating officers out of fear, he takes full responsibility for his conduct and makes no excuses for his actions. As he has expressed to undersigned counsel, he never intended to fight this case because he is not innocent. The only reason Mr. Howe did not plead guilty sooner was at the advice of subsequent defense attorneys who needed to time to familiarize themselves with his case before advising him regarding a resolution. He is ready to move forward and accept the punishment for his actions.

2) <u>Mr. Howe's History and Characteristics</u>

Mr. Howe grew up in a small rural town in Kentucky, where he spent his extracurricular time enjoying the outdoors, riding bikes, and participating in 4-H activities. His family was wholesome and tight knit, and he continues to enjoy a close relationship with his family. His parents instilled in him a hard work ethic and taught him to be a dependable, reliable, and respectful person.[6] Those qualities are apparent to those that know him, who describe him as devoted father, knowledgeable and dependable worker, and caring and generous member of the community, who is always the first to step up to help others in need.

---

[6] *See* Exhibit D-1, Character Letters, at 3.

Others describe Mr. Howe is a "selfless guy who will do anything he can to help those in need and expect nothing in return."[7] This sentiment is a common theme throughout the letters submitted on his behalf who provided numerous examples of his character in action. For instance, when storms hit the area, he is the "first one with a chainsaw, tractor, shovel, truck, or whatever else is needed to help his neighbors, or complete strangers clean up driveways or make roads passable again for the utility vehicles and emergency vehicles to pass."[8] When devastating floods hit Kentucky in July 2022, he gathered donations and supplies and helped those impacted by the floods clean debris and trash and recover cherished items from homes and move to safe housing.[9] After a winter storm last year, a friend lost a huge maple tree in their front yard, and the very next morning, Mr. Howe showed up to cut up the tree.[10] He recently repaired barn roof for elderly neighbor.[11] He and his family took in a family of five during the holidays who had lost power and heat.[12] He is the type of person who is always there to help, even in surprising and unexpected ways,[13] and who reaches out to check on the well-being of those around him who may be struggling with sickness, loss, or hardship.[14]

---

[7] *Id*. at 5-6.
[8] *Id*.
[9] *Id*. at 18-19.
[10] *Id*. at 9.
[11] *Id*. at 16.
[12] *Id*. at 14.
[13] *Id*. at 7-8.
[14] *Id*. at 5-6; 17.

Mr. Howe is also an indispensable asset to his company, Altec, where he has been employed for the last 13 years and helps build equipment for electrical and telecommunications companies. He is a dependable, knowledgeable, and hard-working team member who goes "above and beyond." He is a go-to resource for electrical trouble shooting and training.[15] Many of his colleagues consider Mr. Howe, not just a co-worker, but a member of their family.

Indeed, Altec is where he met his wife, and it is through that union he grew his immediate family. He met his wife when she started working at Altec in 2016, and the pair quickly fell in love. His now-wife Katrina had been a single mother of two young children living paycheck to paycheck. Mr. Howe soon became a loving, supportive, and generous partner and father as they built their family and lives together. Even early during their time together, when Katrina worked the night shift, Mr. Howe would come home from work, make dinner, do dishes, give the kids a bath and put them to bed. He would then wear a baby monitor around his neck while the kids were asleep, and he went outside to tend to Katrina's horses and other outside chores. Describing the impact Mr. Howe has had on herself and the children, his wife says, "He provided us with a home, not just with a house. He provided us with anything and everything we could imagine. He completed us."[16]

---

[15] *Id*. at 5-6; 16; 18-19.
[16] *Id*. at 1-2.

Mr. Howe is an enthusiastic, caring, and supportive father, who does everything he can to support the children's well-being.[17] He and Katrina raise their children to be kind, to write thank you notes, to enjoy the outdoors, and to respect nature. Mr. Howe personally built a tree house and zip line for the kids, and even makes them homemade toys.[18] Mr. Howe and Katrina "are the type of parents all children would want, and other parents want their children to be around."[19]

It will be incredibly difficult for his family (and employer and community) to be without Mr. Howe, but he understands his actions warrant jail time. It is simply hoped the Court will consider lessening the time he spends behind bars by imposing an alternate penalty, such as home confinement in place of a portion of imprisonment.

> 3) <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; to Afford Adequate Deterrence to Criminal Conduct; to Protect the Public from Further Crimes of the Defendant; and to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>

While Mr. Howe's actions were undoubtedly serious, felony convictions and any period of incarceration are serious penalties for a man with no history of assaultive conduct who has never before served significant jail time, particularly because in this instance, incarceration will leave a family without a father and provider. Such penalties certainly

---

[17] See Exhibit D-2, Family Photos.
[18] Ex. D-1 at 7-8.
[19] *Id*. at 4.

promote respect for the law and deter both Mr. Howe and others who are similarly situated from committing such acts in the future.

Protection of the public does not appear to be a significant factor in the instant matter as Mr. Howe has no prior history of assaultive or obstructive conduct, and he has performed exceedingly well while on pretrial release. *See e.g. U.S. v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008)  (75% downward variance reasonable in part because of defendant's "behavior while on a year-and-a-half pretrial release, which the district court found to be exemplary" which is shows defendant unlikely to reoffend);  *U.S. v. Baker*, 502 F.3d 465 (6th Cir. 2007)  (below-guideline sentence of probation with one year house arrest proper in part because the defendant behaved "exceedingly well" while under supervision of pretrial services). Though Mr. Howe has clearly demonstrated he is capable of following the rules and following a law-abiding life, to the extent the Court has concerns about his future conduct, that is easily addressed through a period of supervised release following his imprisonment to ensure he continues on the right path.[20]

4)  <u>The Kinds of Sentences Available</u>

Imprisonment is, of course, not the only form of punishment available to this court. The Court has authority to order home incarceration as condition of supervised release as alternative to incarceration. 18 U.S.C. § 3583 (d); 18 U.S.C. § 3563(b)(19). The Court may

---

[20] Please note that conditions 6 and 7 as listed by U.S. Probation in its recommendation at Docket 74 at p. 4 are inapplicable to this case.

also order community service as condition of supervised release. 18 U.S.C. § 3583 (d); 18 U.S.C. § 3563(b)(12). The defense respectfully requests the Court impose either or a combination of these conditions in lieu of a portion of incarceration.

Following any term of incarceration, Mr. Howe will continue to be monitored on supervised release with restitution obligations, which are also forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of supervised release."); *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"); *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is […] part of the criminal defendant's sentence.").

5) <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct</u>

A downward variance and/or imposing home confinement and community work service in lieu of a portion of jail time would not result in unwarranted sentencing disparities in light of the following cases.

In *U.S. v. Barnhart*, 1:21-cr-35-RC-6, Barnhart received a 36-month sentence on a felony assault for his conduct on January 6. Barnhart assisted his co-defendants in

assaulting multiple officers. After a co-defendant attacked Officer A.W., Barnhart and others attacked Officer B.M. During the course of that attack, Barnhart grabbed Officer B.M.'s ballistic vest and helped drag him headfirst over Officer A.W., down steps into a mob where other rioters beat Officer B.M. with a flagpole and a baton, where he suffered injuries. Dkt. 284. Barnhart then ascended Capitol stairs where he forcefully pushed against and struck at a police line with a flagpole. His social media posts following January 6 reflected pride in his actions. Barnhart received a sentence of 36 months of imprisonment.

In *U.S. v. Jonathan Munafo*, 1:21-cr-330-JEB, was charged with obstruction, assault, civil disorder, theft, and several other offenses. He ultimately pleaded guilty to assault and civil disorder. According to the factual basis in support of the plea, Munafo punched an officer in the face two times with closed fist as another rioter pulled officer's shield down. Munafo then grabbed riot shield from the officer's hands and retreated into into the crowd with riot shield. While attempting entry into the Capitol, he struck a capitol window thirteen times with a flagpole. Munafo was sentenced to 33 months of imprisonment.

In *U.S. v. Rheiner*, 1:22-cr-108-DLF, Rheiner had pushed aggressively against officers while encouraging others to do the same. During his confrontation with police, he forcefully wrestled a riot shield away from an officer and then dragged that officer down several stairs, causing him to fall to the ground. He then entered capitol where he continued to antagonize officers. Dkt. 34. Rheiner received a below-guideline sentence of 15 months.

In *U.S. v. Copeland*, 1:21-cr-570-APM, Copeland had pushed another rioter into an Officer T.R., causing the officer to fall and injure his knee. As other officers rushed to assist Officer T.R., Copeland grappled with them, grabbing at their jackets or riot shields. After engaging in hand-to-hand combat with officers, he joined others in attempting to wrestle a bike rack from officers' control, which resulted in him charging the officers and tossing the bike rack at them. During his initial appearance, Copeland aggressively challenged the court, made unreasonable demands, and threatened physical violence if he did not get what he demanded. He also engaged in threatening behavior with his probation officer and participated in interviews with the media in which he justified his behavior. Dkt. 39. Copeland received a below-guideline sentence of 36 months for his assaults on officers.

In *U.S. v. Byerly*, 1:21-cr-257-RDM, Byerly was charged with assault (111b) for assaulting several officers with a Taser, but pleaded guilty to assault (111a) and striking another person (113) for assaulting a reporter. According to the government, Byerly engaged in three separate assaults-- he activated a stun gun on one police officer and when it was taken by officers, he physically struck them and pushed against them, grabbing an officer's baton, he assaulted a group of officers using an enormous all metal Trump billboard with sharp edges that was capable of splitting someone's head open as a battering ram, and viciously assaulted a member of the press, dragging him up and down the staircase. As the government described it, "Byerly grabbed the victim with both hands near

the victim's shoulder and upper chest and pushed him backward. Byerly then pushed and dragged the victim past the site of the original altercation and towards a dense crowd. Byerly eventually placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall that separated the stairs of the West Front of the Capitol Building from the west lawn below." Byerly was sentenced to 34 months, 12 months below the government's recommendation.

In *U.S. v. Brockhoff*, 1:21-cr-524-CKK, the defendant threw items at law enforcement and discharged fire extinguishers at least five times, and on numerous occasions directly at law enforcement officers on the Lower West Terrace. He then proceeded to the Upper West Terrace bleachers, where he again sprayed officers multiple times with the fire extinguisher. Footage depicts numerous officers swiftly retreating from the spray and flushing their eyes with water following the repeated assaults. During his altercations with police, he obtained a Metropolitan Police helmet, which he wore like a trophy as he entered the Capitol through a broken window. He then repeatedly kicked and forced his way into the Republican Conference Room, where he rifled through boxes and papers within the office and took at least one item found therein. Dkt. 55. Brockhoff received a below-guideline sentence of 36 months.

In *U.S. v. Smith*, 1:21-cr-567-RCL-2, Smith pleaded guilty to obstruction and assault. According to the government, he conspired with codefendant Neefe for two months

to obstruct the certification of the election, planned and prepared for violence, and once there, assisted in hoisting a large metal Trump sign and used it as a battering ram assaulting at least three police officers. Smith was sentenced to 41 months.

In *U.S. v. Miller*, 1:21-cr-75-RDM, Miller pleaded guilty to assault and obstruction after he threw multiple objects at officers and unleashed the contents of a fire extinguisher on more than a dozen officers as other rioters were assaulting them. His co-conspirator (Palmer) threw that same fire extinguisher at officers. Miller was sentenced to 33 months. His co-defendant, Palmer (1:21-cr-328-TSC), who sprayed and threw the fire extinguisher, a wooden plank, and other objects at officers received a higher sentence and lost credit for acceptance of responsibility due to his post-plea conduct.

In *U.S. v. Fairlamb*, 1:21-cr-00120-RCL,  1:21-cr-120-RCL, Fairlamb pleaded guilty to assault and obstruction after entering the Senate Wing one minute after it was breached, screaming at the officers, armed with a police baton which he brandished. He shoved an officer and punched him in the face. He shoved the officer so hard that he fell into a line of rioters, after which he stuck his finger in the officer's face and punched him in the face shield. After January 6, he both lied about and bragged about his activities. He was sentenced to 41 months.

Cases in which defendants received sentences significantly higher sentences typically reflect aggravated circumstances in comparison to the instant case. For example, in *U.S. v Sandlin*, 1:21-cr-88-DLF, Sandlin pleaded guilty to assault and obstruction and

was sentenced to 63 months. Sandlin and his co-conspirators brought with them on January 6 a bringing a car full of weapons, including knives, bear spray and a pistol fully anticipating violence; Sandlin then directly assaulted at least 2 capitol police officers – attempting to rip off one officers helmet and taking a swing at another officer's head, making contact with the back of his head near his ear, and assisted in the assault of at least 4 others, then, in the aftermath both celebrated his participation and tried to profit off of it and obstructed the investigation.

It also bears considering the sentences defendants have received for extremely dangerous and assaultive conduct during the course of non-January 6 riots. For example, in *U.S. v. David-Pitts*, 2:20-cr-00143-JCC (W. Dist. Wa.), the defendant was sentenced to just 20 months after setting fire to a Seattle police station while others tried to barricade the door to prevent officers from leaving as the building burned.

In *U.S. v. Willoughby*, 2:20-cr-00111-JCC (W. Dist. Wa.), Willoughby was sentenced to 24 months after he committed a pre-planned arson to a police station when he emptied a container of gasoline around the perimeter of the building, set it ablaze, and walked away.

In *U.S. v. Williams*, 20-cr-181 (Dist. Mn.), the defendant was sentenced to 27 months for burning down a police station.

Last, although there is insufficient data to perform a JSIN analysis on the obstruction charge, JSIN does provide adequate data for the assault count to which Mr. Howe pled. On

the assault count, Mr. Howe would have faced a guideline range of 37-46 months (20 x CH II). According to JSIN, over the past five years, the median sentence for defendants in this cell was 37 months, and the average sentence was 34 months.

6) <u>The Need to Provide Restitution to Any Victims of the Offense</u>

Mr. Howe has agreed to pay the requested restitution amount of $2000.

**III.   CONCLUSION**

For the foregoing reasons, it is respectfully requested that the Court impose alternative penalties in lieu of a portion of incarceration in this matter.

DATED at Anchorage, Alaska this 16th day of October, 2023.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

<u>/s/ Gretchen L. Staft</u>
Gretchen L. Staft
Assistant Federal Defender

<u>Certificate of Service</u>:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on October 16, 2023. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
<u>/s/ Gretchen L. Staft</u>